Page 1

```
 1         UNITED STATES DISTRICT COURT
 2           DISTRICT OF MASSACHUSETTS
 3  Civil Action No. 1:12-cv-10136-AK
 4  - - - - - - - - - - - - - - - -x
 5  PERICLES CLERGEAU,
 6           Plaintiff,
 7      v.
 8  MASSACHUSETTS DEPARTMENT OF
 9  CORRECTION, et al.,
10           Defendant.
11  - - - - - - - - - - - - - - - -x
12
13         DEPOSITION OF DAVID KEELER
14         Conducted Remotely via Zoom
15      Souza-Baranowski Correctional Center
16              Shirley Road
17           Shirley, Massachusetts
18              May 12, 2023
19               11:06 a.m.
20
21  Daria L. Romano, RPR, CRR, and Notary Public
22
23
24
```

Page 2

```
 1  APPEARANCES VIA ZOOM:
 2
 3     SIMONS LAW OFFICE
 4     (by Natalie Sreca, Esq.)
 5     10 Post Office Square
 6     Boston, Massachusetts 02109
 7     (617) 544-9000
 8     natalie@jbsimonslaw.com
 9     Counsel for the Plaintiff.
10
11     LEGAL DIVISION, DEPARTMENT OF CORRECTION
12     (by Margaret Melville, Esq.)
13     70 Franklin Street
14     Boston, Massachusetts 02110
15     (617) 727-3300
16     margaret.melville@doc.state.ma.us
17     Counsel for the Defendants.
18
19
20
21
22
23
24
```

Page 3

```
 1              I N D E X
 2  Deposition of:                Page
 3  DAVID KEELER
 4    By Ms. Sreca                  4
 5
 6
 7             E X H I B I T S
 8  No.                            Page
 9  Exhibit 1   Use-of-force package   33
10
```

Page 4

```
 1          P R O C E E D I N G S
 2      MS. SRECA:  Just for the record,
 3  we'll do the same stipulations from the
 4  previous deposition.  I can repeat them,
 5  Margo, if you'd like.
 6      MS. MELVILLE:  I agree to the
 7  same stipulations.
 8      MS. SRECA:  Okay.
 9
10          DAVID KEELER,
11
12  a witness having been satisfactorily
13  identified by the production of a Department
14  of Corrections ID, was first duly sworn, was
15  examined and testified as follows:
16
17         DIRECT EXAMINATION
18  BY MS. SRECA:
19      Q.  All right.  Lieutenant Keeler, can
20  you just again state your name for the
21  record?
22      A.  Sure.  Lieutenant David Keeler,
23  K-E-E-L-E-R.
24      Q.  Have you ever been deposed before?
```

Page 13

1    A.  -- involving him.
2    Q.  Okay.  So you personally haven't had
3  any interactions with him that stick out in
4  your mind besides the incident that you
5  reported to?
6    A.  Correct.
7    Q.  Okay.  Were you working on June 30,
8  2018?
9    A.  Yes.
10   Q.  Were you the -- well, what shift
11 were you working at the time?
12   A.  I was working the day shift.
13   Q.  And what -- what position were
14 you -- what was your title at that time?  You
15 were a lieutenant?
16   A.  I was a level 1 lieutenant.
17   Q.  Do you recall who you were working
18 with that day?
19   A.  If I had a roster.  I don't
20 remember.  I could guess, but I wouldn't want
21 to guess wrong.
22   Q.  And as a level 1 lieutenant, were
23 you assigned to any particular unit?
24   A.  No, not one particular unit, no.

Page 14

1    Q.  All right.  Can you describe for me
2  what you remember from June 30, 2018?
3    A.  In regards to?  I mean, it was a
4  Saturday, I think.
5    Q.  Yes.
6        So you had mentioned that you
7  reported to an incident involving
8  Mr. Clergeau.  Do you recall what date that
9  incident happened?
10   A.  I think you just said it, June 30th.
11   Q.  June 30, 2018.  Okay.  So when you
12 responded to that incident, can you describe
13 what you observed?
14   A.  Yeah.  I entered the unit, and there
15 was a big mess at the officer station.  I
16 didn't know what had happened.  All I know is
17 there was a radio transmission from I think
18 the control room that there was an incident
19 in the unit.
20       I reported to the unit, and when I
21 first entered the unit, the only thing I
22 noticed that stood out in my mind was there
23 was breakfast everywhere.  There was orange
24 juice on the floor and eggs on the desk and a

Page 15

1  McDonald's bag.
2    Q.  Okay.  Do you recall where any
3  officers and inmates were located when you
4  arrived?
5    A.  Yeah, there was -- there was
6  officers and at least one inmate in the
7  officer station office, and a tier -- I
8  believe the cells that were open were from 49
9  to 64, so there were 16 or 17 cells open.
10       There was an inmate food cart, like
11 a warmer, at the officer station along with a
12 juice -- Cambro for juice or coffee was on
13 the flats.
14   Q.  Do you recall anything specific
15 about the officers and the one inmate you
16 observed near the officer station?
17   A.  So at first glance it appeared to me
18 that there was -- they were trying to control
19 an inmate.  I didn't know how many inmates
20 were in there or how many officers.  And it
21 appeared to me that that situation was, for
22 lack of a better term, under control, and
23 they didn't need my assistance in what they
24 were doing.

Page 16

1        My concern was the open cells and
2  the inmates that were unsecured in the unit.
3    Q.  Okay.  So what did you do after
4  making those observations?
5    A.  I tried to activate the officer
6  station terminal.  I was giving inmates
7  directives to find their doors.
8        I think I made a phone call, I'm not
9  100 percent sure.  I called the control room
10 to get control of the officer station panel
11 back.  And I gave the inmates that were out
12 on the flats direction to secure in their
13 cells.
14       And I began securing the unit, and
15 there was some other stuff.  There was some
16 background there.  I think there was a
17 training video or there was something set up
18 that was running on the computer.  I couldn't
19 turn the volume down, so I just tried to turn
20 it off.
21       And once that happened, I couldn't
22 give you an accurate number, but additional
23 staff had reported to the unit.  And
24 somewhere along the line -- I mean, I

Page 17

1  couldn't give you an accurate time -- one of
2  the officers came up from the officer station
3  where they were with the inmate and suddenly
4  collapsed on the floor.
5      At that point there was a radio
6  transmission that there was a medical
7  emergency for a staff member, so my focus
8  turned to the staff member that was in a
9  medical emergency on the floor.
10     Q.  Okay.  Do you remember who that
11  officer was?
12     A.  It was Officer Christopher Shaw.
13     Q.  Do you remember any other officers
14  that were present or responded?
15     A.  I don't remember everyone off the
16  top of my head.  I remember a few people that
17  were there, but I don't remember all of them.
18     Q.  Okay.  So aside from Officer Shaw,
19  who do you remember being there?
20     A.  I remember Sergeant Fuentes, who was
21  the officer that called the radio
22  transmission.  I think Officer Polak was
23  there, Officer Sampson.
24      It happened so quick, and my

Page 18

1  adrenaline was so high.  If I said anybody
2  else's name -- those are the only few that I
3  remember.
4      Q.  Okay.  And do you recall who the
5  inmate was that was near the officer station?
6      A.  That was in the officer station or
7  was near it?
8      Q.  Who was engaged with the officers
9  when you observed that that situation
10  appeared to be under control?  Do you recall
11  who that inmate was?
12     A.  I didn't know him at the time.  All
13  I knew was that he was a person of color.  I
14  later, after everything was said and done,
15  came to know that it was Inmate Pericles
16  Clergeau.
17     Q.  All right.  Do you recall whether
18  Mr. Clergeau had been confined at any point?
19     A.  So somewhere between Officer Shaw
20  collapsing on the floor and securing the
21  inmates I did notice that the situation was
22  neutralized, that he was in restraints, and
23  he was in the back room.
24     Q.  Okay.  Did you have an opportunity

Page 19

1  to observe Mr. Clergeau at any point?
2      A.  Observe him?  I mean, I did --
3      Q.  Did you, like, approach and get
4  close enough where you could see him?
5      A.  No.
6      Q.  Okay.  Are you aware of whether
7  any -- any force was used against
8  Mr. Clergeau?
9      A.  Yeah, yes.
10     Q.  And how did you become aware of
11  that?
12     A.  Well, when I first entered, like I
13  said, I observed that there was enough staff,
14  it appeared to be enough staff, and they were
15  trying to get him into restraints.
16      And then my focus shifted on the
17  tier where the inmates weren't secure in
18  their cell.  So any time that -- I mean, for
19  lack of a better term, there was certainly no
20  compliance by Mr. Clergeau.  I mean, I
21  couldn't detail his degree or specific nature
22  of his noncompliance.  All I could -- a
23  reasonable inference I made was that he was
24  resisting them, and they were doing their

Page 20

1  best to get him into restraints, and I
2  focused on the tier.
3      Q.  Okay.  But at the time you weren't
4  able to make a determination about
5  Mr. Clergeau's level of noncompliance?
6      A.  His level of noncompliance?  He
7  wasn't -- like, they were telling him to do
8  things, and he wasn't doing them.  They
9  repeatedly told him to do things that he
10  wasn't doing.  So it was both verbal and
11  physical, I guess, level of compliance or
12  noncompliance.
13     Q.  Okay.  So it sounds like you heard
14  officers making verbal commands to
15  Mr. Clergeau?
16     A.  I believe so.
17     Q.  Do you remember anymore details
18  about those verbal commands or who they were
19  coming from?
20     A.  I couldn't -- I couldn't tell you
21  who.
22     Q.  Okay.
23     A.  I was -- to the best of my
24  recollection, it was multiple people telling

Page 21

1 him at multiple points to stop -- you know,
2 place your hands behind your back.  It was --
3 for lack of a better term, it was what we do
4 all the time.
5     Q.  Okay.  All right.  Do you have any
6 recollection about which specific officers
7 participated in regaining control?  I know
8 you only remember a handful who were there.
9     A.  I -- I remember Officer Lussier and
10 Officer Shaw only because they were working
11 the unit.  Anybody else that was in -- in
12 distance of them I couldn't, like, see them
13 facially.
14     Q.  All right.  Did you participate at
15 all in regaining control of Mr. Clergeau?
16     A.  No.
17     Q.  So you mentioned that Officer
18 Polak -- did I pronounce that right?
19     A.  I believe it's Polak, yes.
20     Q.  -- and Officer Sampson were also
21 present.  Do you remember anything about what
22 their role was during the incident?
23     A.  No.  I only, like, recognized them
24 afterwards, after everything was all done.

Page 22

1     Q.  And to your recollection, do you
2 remember seeing any officers use force
3 against Mr. Clergeau during restraining him
4 on the ground?
5     A.  Using -- yeah.  He wasn't doing what
6 they told him to do.  He was actively
7 resisting the officers.
8     Q.  Okay.  What kind of force did you
9 see used?
10     A.  It was physical force.
11     Q.  Okay.  Can you describe it?
12     A.  I didn't witness it, but I can only
13 infer that it was them trying to grab his
14 hands and his legs to try to get them into
15 restraints.
16     Q.  Okay.  And what are you making that
17 inference based on?
18     A.  Based on the verbiage that I heard
19 from the unit.
20     Q.  Okay.  How is it that the officers
21 would have attempted to, you know, grab his
22 hands and get the wrist restraints on and the
23 leg restraints?  Is there a particular
24 process that officers are trained on with

Page 23

1 that regard?
2     A.  Well, in training, yeah.  Training
3 doesn't cover every incident, though.
4     Q.  Okay.  Are you familiar with the
5 use-of-force pyramid?
6     A.  Yes.
7     Q.  Okay.  Can you describe it for me?
8     A.  I think there's seven or five
9 levels.  I know it's an odd number.  But it
10 goes from passive resistance in the beginning
11 stages of the pyramid to active resistance to
12 the top, which is physical harm.  I'm missing
13 some of the middle stages.  You don't go
14 straight from talking to somebody to
15 physically engaged with them.
16     Q.  Okay.  And what is the purpose of
17 the use-of-force pyramid?
18     A.  The purpose of it is to -- to judge
19 the amount of force that one would use in a
20 certain situation.
21     Q.  Okay.  Is it -- at what point is the
22 use-of-force pyramid referenced to make that
23 determination?
24     A.  Could you rephrase that?  I don't

Page 24

1 understand your question.
2     Q.  Sure.
3       So the use-of-force pyramid is used
4 to judge the amount of force that's
5 appropriate according to an inmate's conduct.
6 Is that referenced before the force is used,
7 during the application of force, afterwards?
8     A.  I think it's when the -- when the
9 incident is occurring.
10     Q.  Okay.  And did you write a report in
11 reference to this incident?
12     A.  Yes.
13     Q.  Okay.  Did you reference the
14 use-of-force pyramid at all in the writing of
15 your report?
16     A.  No.
17     Q.  Do you recall -- what was your
18 report for?  Was it for anything specific?
19     A.  So I -- I witnessed the force taking
20 place, so I wrote my report to reference the
21 incident.
22     Q.  Okay.  Do you recall whether your
23 report was a part of the use-of-force
24 package?

Page 29

1   A.  Yes.
2   Q.  And then the second line under
3  there, "At what level of the pyramid of force
4  was the inmate at when force was utilized?"
5   A.  Mm-hmm.
6   Q.  Okay.  What does that next part
7  read?
8   A.  And answer to the question?
9   Q.  Yes, the answer to the question.
10   A.  "Assault with serious bodily
11  injury."
12   Q.  Okay.  Who made that determination?
13   A.  I entered that information.
14   Q.  Okay.  Do you recall how you made
15  that determination?
16   A.  Yes.  When -- when Officer Shaw was
17  removed from the unit on a gurney.  So this
18  package was prepared, for lack of a better
19  time frame, between 60 and 90 minutes from
20  the completion of the incident.  We don't
21  have a -- I'm not trying to be curt, but we
22  don't have -- we don't have a handheld.  We
23  don't have any way to enter this information
24  until everything is said and done.

Page 30

1   Q.  Sure, okay.  How soon after the
2  incident did you write the incident report
3  that you had been referring to?
4   A.  My best guess is 45 minutes to an
5  hour.
6   Q.  Okay.  So pretty soon after.
7       And then am I correct to understand
8  that the use-of-force package that's prepared
9  is done in a longer time period after the
10  incident?
11   A.  Correct.
12   Q.  Okay.  And, I'm sorry, about how
13  long after it did you say you did that?
14   A.  The package?
15   Q.  Yes.
16   A.  This one took quite a long time.
17  The department requests extensions beyond 20
18  days.  I'm not sure without -- I haven't
19  reviewed the package.  I think it was
20  requested, there was an extension requested.
21       I am not sure off the top of my head
22  how long Officer Shaw was out for the
23  injuries he sustained or if anybody else was
24  out on industrial accident.  So sometimes it

Page 31

1  can take quite a while.  I'm going to guess,
2  and this is just a guess, I'm going to guess
3  that this was, I don't know, maybe three
4  weeks.  That's just a guess.
5   Q.  All right.  Okay.  So what -- going
6  back to this, "Assaulted with serious bodily
7  injury," what do you consider when making
8  that determination?
9   A.  What do I -- the nature of the
10  injuries sustained by anyone involved.
11   Q.  Okay.  So this is a -- from kind of
12  20/20 hindsight looking back at the incident?
13   A.  This is from 20/20.
14   Q.  Right.  So this -- this
15  determination, what level of the pyramid of
16  force was the inmate at, that determination
17  is made after the incident?
18   A.  Correct.
19   Q.  Okay.  And is that based on
20  reviewing reports from responding officers
21  who were present during the incident?
22   A.  That's based on a myriad of
23  information.  It's based on video review,
24  officer testimony, officer reports.  We have

Page 32

1  an intelligence unit here that interviews the
2  other inmates in the unit.  So there's a lot
3  of various information input into that.
4       But the initial assessment was --
5  from this incident was based on the testimony
6  of the officer in the unit.
7   Q.  Okay.  Is the inmate involved ever
8  interviewed in the -- as a part of that
9  consideration?
10   A.  This package or every package in
11  general?
12   Q.  Just generally.
13   A.  Generally, yes.
14   Q.  Okay.  Are you aware of whether
15  Mr. Clergeau was interviewed in reference to
16  this specific incident?
17   A.  I can only assume that he was.
18   Q.  Okay.  But you wouldn't have been
19  the one to interview Mr. Clergeau?
20   A.  No, I don't do that.  A third party
21  does the interview, someone that's generally
22  as a commissioner's pick or superintendent's
23  pick will do the interview with the inmates
24  involved.

Page 37

1  to have a debriefing after the incident?
2     A.  Yes, when applicable, yes.
3     Q.  Okay.  Did the debriefing in this
4  situation occur prior to writing the report?
5     A.  My report -- I believe I offered my
6  report before the debriefing.
7     Q.  Are you aware of whether any of the
8  other officers involved wrote their report
9  after the debriefing?
10    A.  I don't know.
11    Q.  Okay.  And was the incident itself
12 discussed in any detail at the debriefing?
13    A.  The only details of the debriefing
14 that I remember were that Officer Shaw was
15 taken to an outside hospital for treatment of
16 his injuries.  Other than that, there was
17 nothing specific about the incident, the
18 nature or what happened.  It was just the
19 nuts and bolts of it, the time, the date, the
20 unit, the inmates.
21       The only thing in specific regarding
22 the incident that I remember was that Officer
23 Shaw was taken to an outside hospital for
24 treatment to his injuries.

Page 38

1     Q.  Okay.  Do you recall whether
2  Mr. Clergeau suffered any injuries during
3  this incident?
4     A.  I reviewed the reports that I
5  submitted for the use-of-force package.
6  That's the only way I knew of anything that
7  had happened to Inmate Clergeau.
8     Q.  Okay.  Are you aware of anyone else
9  witnessing use of force against Mr. Clergeau?
10    A.  The only -- the only staff that I
11 know of that witnessed use of force on
12 Mr. Clergeau were the ones documented in the
13 use-of-force package.
14    Q.  Okay.  Do you recall ordering
15 Officer Polak and Officer Sampson to escort
16 Mr. Clergeau after the incident once he was
17 restrained?
18    A.  I believe I directed people to
19 escort him.  Somehow I think it got -- my
20 verbal communication got mixed up.  I don't
21 think the people that I told to escort him
22 were the ones that actually escorted him.
23    Q.  Okay.  Do you remember who you --
24 who you think you told had escort him?

Page 39

1     A.  I think I told Officer Polak and
2  Officer Sampson, and somehow it didn't wind
3  up that way.
4     Q.  Okay.  Do you have any memory of who
5  did escort him?
6     A.  My only -- the only way I knew who
7  escorted him was reviewing video
8  surveillance.
9     Q.  Do you recall from reviewing the
10 reports, the incident reports by other
11 officers, whether anything unusual happened
12 during the escort?
13    A.  Vaguely, not specifically.
14    Q.  Okay.  What's your vague
15 recollection of that?
16    A.  So when the inmate was brought to
17 the health services unit, they said that he
18 tripped or fell.  But that was through the
19 reviewing the incident reports and the video
20 surveillance.
21    Q.  Okay.  Do you know whether
22 Mr. Clergeau suffered any injuries as a
23 result of that trip or fall?
24    A.  I don't.  Nothing was documented in

Page 40

1  the reports, and I didn't review the
2  investigator's report of any injuries that he
3  sustained from the fall.
4     Q.  Okay.  Did you ever review the
5  use-of-force cover letters for this incident?
6     A.  I -- I don't have access to those.
7     Q.  Okay.  So it would not have been
8  sent to you?
9     A.  No.
10    Q.  Okay.  Are you aware of whether the
11 use-of-force package was subject to any other
12 type of investigation?
13    A.  I'm not aware of any, no.
14       MS. SRECA:  All right.  If we
15 want to take a quick, probably two-minute
16 break, I'm just going to check my notes
17 really quick and see if I have anything else.
18       MS. MELVILLE:  Okay.
19       MS. SRECA:  Thank you.
20       (Recess taken)
21 BY MS. SRECA:
22    Q.  I do just have a few more questions.
23       Do you remember what unit this
24 June 30th incident happened on?

Page 41

1  A.  P1.
2  Q.  And what kind of unit is P1?
3  A.  At the time of the incident it was a
4  general population housing unit.
5  Q.  Okay.  Has that designation changed
6  since the incident?
7  A.  Yes.
8  Q.  And what is it now?
9  A.  Since January 10th it's become a --
10  I don't want to use the wrong term.  It's
11  a -- its mission has changed to -- I don't
12  know the term we use.  We used to a quay
13  system.  So you wouldn't put predators with
14  prey, victims with victimizers.  This unit is
15  specifically now designed to keep
16  unmanageable offenders in low numbers.  I
17  don't want to speak for the mission of the
18  department, but it's to keep the facility
19  safer for everyone who works in and resides
20  there.
21  Q.  Okay.  So it wasn't a specialized
22  unit in 2018, but now it is a specialized
23  unit?
24  A.  I wouldn't use the term

Page 42

1  "specialized."  It's modified.  Its mission
2  has been modified.
3  Q.  Okay.  Do you know if Souza has a
4  unit specifically for inmates with mental
5  health issues?
6  A.  Yes, there are.
7  Q.  And how many units?
8  A.  At that time or now?
9  Q.  Now.
10  A.  Now there's three, three or four.
11  Q.  Okay.  And on January 30, 2018, had
12  there been specialized units for mental
13  health?
14  A.  Yes.
15  Q.  Do you recall what those units were?
16  A.  At the time I believe they were STP.
17  The acronym is Secure Treatment Program.  And
18  there was another housing unit.  They moved
19  constantly.  I think it was J1.  And those
20  were -- I think at the time were designated
21  for offenders with mental illnesses.
22  Q.  Okay.  Are you aware of whether
23  Mr. Clergeau has any serious mental illness?
24  A.  At the time I didn't.  Currently now

Page 43

1  I do.
2  Q.  Do you happen to know what unit
3  Mr. Clergeau is currently housed in?
4  A.  I think he's in the STP right now.
5  Q.  Have you ever worked this unit?
6  A.  No.  Well, not in the last five
7  years.
8  Q.  Okay.  Do you know about when you
9  last worked for this unit?
10  A.  Well, I can say with degree of
11  certainty, it hasn't been since June of 2011,
12  which is when I got promoted to lieutenant.
13  I never worked that unit as a lieutenant.  So
14  sometime prior to 2011.
15  Q.  Do you know if DOC requires any
16  training to work the mental health unit?
17  A.  I believe there are specific
18  training modules for those units, yes.
19  Q.  Okay.  And does any officer who
20  works the unit at any point need to receive
21  that specific training?
22  A.  I believe it's in their training
23  folder, yes.
24  Q.  Okay.  So, for instance, if an

Page 44

1  officer is swapping a shift and he doesn't
2  normally work that unit, would he have to
3  participate in that specialized training in
4  order to work a shift on that unit?
5  A.  I don't believe so.
6  Q.  Is it fair to say that only officers
7  who are specifically assigned the unit would
8  need that training?
9  A.  That's a fair statement.
10  Q.  Okay.  So that would be DOC's
11  policy?
12  A.  I believe so.  I have to talk to the
13  institutional training officer to verify it.
14  Q.  Okay. All right.  Have you ever
15  received any specialized training for mental
16  health, dealing with mental health inmates?
17  A.  No.
18  I believe there's also a designation
19  on our roster for staff who have been trained
20  in those units, so the shift commander or
21  shift lieutenant can fill vacancies in the
22  units, they can reference the roster for the
23  staff that have received the training.  So we
24  do our best to put the best resource and in