**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

PERICLES CLERGEAU,           )

)

Plaintiff,       )     Civil Action No. 1:21-CV-10136-AK

)

v.          )

)

MASSACHUSETTS DEPARTMENT OF   )
CORRECTION, et al.,        )

)

Defendants.    )

_____)

**MEMORANDUM AND ORDER ON**
**MOTION FOR SUMMARY JUDGMENT**

**ANGEL KELLEY, D.J.**

Plaintiff, Pericles Clergeau brings this action, alleging a lack of adequate health treatment and the use of excessive force against him as an inmate at the Souza Baranowski Correctional center ("SBCC"). Plaintiff filed this action against the Department of Correction ("DOC"), Correctional Officers Alexander Lussier, Nicholas Polak, David Keeler, Thomas Evans, and Christopher Shaw, former Correctional Officer Joseph Sampson, Former Superintendents at SBCC Steven Silva and Steven Kenneway, Standing Superintendent at SBCC Dean Gray, and Commissioner of Correction Carol Mici (together "the Defendants"). [Dkt. 1-1]. Clergeau asserts that he was subjected to the excessive use of force during an incident when he had an altercation with one or more Correctional Officers ("CO" or "Officer Defendants") and that he was subjected to differential medical treatment because of his mental illness. [Dkt. 1 at 4]. The Defendants move for summary judgment on all claims including Clergeau's claims of excessive

1

use of force and assault and battery and Clergeau's claims under the Americans with Disabilities Act ("ADA").[1]  [Dkt. 75].

On January 26, 2021, Plaintiff filed his Complaint against the Defendants.  [Dkt. 1]. Defendants filed their Motion of Summary Judgment on August 1, 2023.  [Dkt. 75].  The Court heard oral argument on Defendants' Summary Judgment motion on December 14, 2023 and took the matter under advisement.  [Dkt. 102].

For the following reasons, the Defendants' Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**.  The Motion is **GRANTED** as to Plaintiff's claims that the Defendants violated the ADA, when they failed to provide necessary medical care or tend to his mental health needs, as well as claims alleging a failure to provide proper training regarding the use of excessive force, and claims of retaliation, because he lacks sufficient evidence to support these claims. The Motion is also **GRANTED** as to all claims brought against Officer Keeler, DOC, Steven Silva, Stephen Kenneway, Dean Gray, and Carol Mici.  The Motion is **DENIED** as to the Eighth Amendment claims for excessive use of force along with assault and battery, brought against the Officer Defendants Alexander Lussier, Nicholas Polak, Thomas Evans, and Christopher Shaw in their personal capacities.

## I.    BACKGROUND

Unless otherwise noted, the facts below are undisputed and are pulled from the Defendants' statement of material facts [Dkt. 82], Plaintiff's response to that statement [Dkt. 84], and Plaintiff's additional statement of facts.  [Dkt. 87].  Facts that are undisputed shall be

---

[1] Prior to securing counsel, Clergeau's filed his complaint pro se.  [Dkt. 1].  The format is not entirely clear and it is difficult to discern the basis for each claim.  The Court understands Clergeau to be bringing claims for violation of the Eighth Amendment and excessive force, assault, and battery (Count III and IV) for his treatment during the altercation; indifference to Clergeau's medical needs in violation of the ADA and Eighth Amendment (Counts II, III, and V) both after the altercation and throughout his incarceration;  inadequate training and supervision on the part of the prisons' leadership (Counts II, III, and IV); and retaliation (Count III) for his treatment following the altercation.

considered admitted for the purposes of this motion.  See Local Rule 56.1.  Below is a summary of some of the critical facts.  Additional facts will be addressed as necessary in the discussion section.

### A.  Altercation between Clergeau and the Defendant Officers

The Souza Baranowski Correctional Center ("SBCC") is a maximum-security state prison located in Shirley, MA.  [Dkt. 87 at ¶ 1].  COs Lussier and Shaw were the only officers assigned to Clergeau's housing unit the morning of June 30, 2018.  [Id. at ¶ 2].  Officer Shaw started the morning with the Inmate Count, which required him to walk to each cell door and check on each inmate.  [Id. at ¶¶ 4-5].  Clergeau alleges that when Shaw came to his door, Shaw taunted him about Clergeau's mental health and then threatened and provoked him.  [Dkt. 100-13 ("Clergeau Tr.") at 12:18-13:5].  Clergeau could not recall exactly Shaw's words or his own response.  [Id. at 13:3-10].  He does assert that Shaw came back to his door and challenged him to a fight.  [Id. at 13:11-24].  These allegations are partially corroborated by another inmate, Tamik Kirkland, who reported observing Shaw refer to Clergeau with derogatory language, threaten him with harm.  [Dkt. 87-2 at ¶¶ 3-5].  Like the Plaintiff, Shaw feels his memory is "distorted" from the injuries he sustained, and he has no recollection of what words were exchanged at that time.  [Dkt. 95-2 ("Shaw Tr.") 25:2-8].

When the cell doors opened, Clergeau went down the stairs from his cell and saw Officer Shaw; he immediately "felt threatened," "had a mental breakdown," and could not recall fully what happened after that.  [Clergeau Tr. at 15:12-16].  Officer Lussier reports he observed Clergeau come down the stairs from his cell.  [Dkt. 87 at ¶ 12].  Clergeau walked towards Shaw,

although the Officers dispute whether he did so in an aggressive or normal manner. [Dkt. 87 at ¶¶ 15-17; Dkt. 87-4 at 7].[2] Clergeau then started to strike Shaw. [Dkt. 87 at ¶ 19].

When Clergeau attacked Shaw, the two began to struggle with one another; both fell into Lussier and then into a backroom where the balance of the altercation was not captured on camera. [Dkt. 87 at ¶ 18]. Clergeau struck Lussier and Shaw multiple times with punches and the officers struck him back with punches to his mid-section and groin. [Dkt. 95-1 ("Lussier Tr.") at 19:2-21; Dkt. 87-4 at 6]. While waiting for the emergency response, Shaw and Lussier attempted to gain control of Clergeau by grabbing his arms and striking him. [Dkt. 87 at ¶ 25; Dkt. 87-4 at 6; Lussier Tr. 23:1-7]. Within half a minute of Clergeau being pulled into the backroom, several other officers arrived on the scene and at least two officers entered the backroom. [Dkt. 87-5 SUOF 364 P1 DR1 ("backroom video") 7:38-39]. Clergeau was on his stomach the entire time he was in the backroom, which was for an excess of five minutes, per the available camera footage. [Dkts. 87 at ¶ 29; backroom video].

Once he was in the backroom, Clergeau was shackled almost immediately. [Clergeau Tr. 21:10-13; Dkt. 100-14 ("Polak Tr.") 21:11-22]. At some point, while Clergeau was being held by his legs and was going in and out of consciousness, he recalls officers standing up in front of him and kicking him in the head. [Clergeau Tr. 17:1-10; 20:2-22]. Clergeau recalls Lussier saying provocative things about him, though Clergeau does not recall exactly what those things were. [Id. at ¶ 21:14-22:7]. Clergeau identifies Officer Sampson as one of the officers who kicked him in his face.[3] [Id. at 22:21-23:2]. He also said that his eyes were shut from his injuries, which prevented him from seeing clearly. [Id. at 22:17-20].

---

[2] While some of the beginning and aftermath of the altercation was captured on video, the bulk of the altercation took place out of view of any camera.

[3] Ex-Correctional Officer Joseph Sampson is no longer employed by the DOC and is not a party to the Defendant's Motion for Summary Judgment here. [Dkt. 75]. Therefore, his actions as an individual officer will not be the focus

When Officer Polak arrived on the scene, he observed Clergeau lying face down; he described Clergeau as being non-compliant but also not an immediate threat to staff any longer. [Polak Tr. 21:11-22].   Polak recalled seeing Lussier placing Clergeau in what appeared to be a headlock.  [Id. at 20:20-21].  Polak then relieved Lussier because Lussier looked like he was injured and had blood on his face.  [Polak Tr. 21:7-10].  Lussier testified that he first gained control of Clergeau's legs and put the restraints on them.  [Lussier Tr. 24:22-24].[4]  The officers who arrived in the backroom also assisted Lussier in grabbing Clergeau's legs and placing those restraints.  [Id. at 24:19-24].  One of those officers was Officer Evans, who Clergeau alleges took part in the beating.  [Dkt. 100-5 ("Evans Tr.") at 17:3-6; Compl at ¶ 20].  Clergeau did not see Shaw in the backroom.  [Dkt. 87 at ¶ 32].  Clergeau asserts that the shackles were put on him within seconds of being there.  [Clergeau Tr. 19:20-21].

When Lt. Keeler arrived, he saw that the officers had the situation "under control" with Clergeau in restraints.  [Dkt. 99 ("Keeler Tr.")  15:2-24].  Keeler instead focused on securing the area and returning other inmates to their cells.  [Id. at 16:1-2; Backroom video 7:38:24-34; Dkt. 87 at ¶ 50].  Shortly after leaving the backroom, Officer Shaw walked out and collapsed on the floor.  [Dkt. 87 at ¶ 53; Backroom video 7:38-39].  A medical emergency was called for Shaw, and he was removed from the unit on a gurney, taken to a trauma room, and then to an outside hospital.  [Dkt. 87 at ¶¶ 54, 56].[5]

---

of the Court's inquiry here as it evaluates the liability of the Officer Defendants.  Ex-CO Sampson is a named Defendant in this case.  [Dkt. 1].  Summons for him were served to Attorney Meville.  [Dkt. 50].  Attorney Melville asserts that she returned the summons to Clergeau because she did not represent Sampson as an ex-employee. [Dkt. 102].

[4] Officer Evans also testified that he was the one who restrained Clergeau's legs.  [Evans Tr. 18:3-6].

[5] Officer Shaw attests that he suffered a concussion, was out of work for several months, had to undergo vestibular rehabilitation which affected his balance, light sensitivity, and became bedridden for a period of time.  [Shaw Tr. 32:22-33:4].

After handcuffs and leg irons were placed on Clergeau, Officers Polak, Lussier, and Sampson stood Clergeau up and escorted him out of the unit towards the Health Services Unit (HSU) for treatment.  [Polak Tr. 19:11-15].  Clergeau, claims that he did not see a nurse or medical staff when he was brought to the HSU room and that he was tortured by officers for 20-30 minutes, all while the medical staff waited for clearance from the officers to see him.  [Clergeau Tr. 24:15-24].  Clergeau asserts that while in a room of the HSU, he was being held down on his stomach forcibly and officers, in particular Lussier, said things like, "you are going to spend the rest of your life in prison. We're going to make sure of that. You're going to be treated like shit from now on."  [Clergeau Tr. 27:8-18].  No video footage exists of Clergeau's treatment while he was inside the HSU backroom.

HSU staff determined that Clergeau should be sent to a hospital and Clergeau was then secured in a holding cell in the HSU where his restraints were removed.  [Polak Tr. 19:16-20].  Clergeau asserts that the medical staff in the HSU was concerned about his injuries and argued with the officers for clearance to take him sooner; eventually the officers transported Clergeau to the hospital themselves.  [Clergeau Tr. 26:2-21].

Clergeau's injuries from that day included one broken tooth (and possibly another lost tooth), dislocated fingers, a fracture at the top of his jaw, swelling that shut his eyes, a contusion on his eyeball and orbital tissues, permanent damage to his right eye, a contusion of the scalp, and pain in both wrists.  [Dkt. 87 at ¶ 29; Clergeau Tr. 47:1-11; 87-13 at 1-2].  Clergeau asserts the beatings exacerbated his mental health conditions causing him anxiety attacks.  [Clergeau Tr. 48:18-49:1].

### B.  Clergeau's medical needs

Beyond that altercation, Clergeau's complaint blames the facility's mental healthcare system for its failure to treat his mental illness and he brings suit against the facility's leadership to address this.  Clergeau has been diagnosed with multiple mental illnesses.  [Clergeau Tr. 11:1-5].  He alleges that the defendants implement customs and practices that deny him mental health treatment and allow retaliation by staff.  [Dkt. 1-1 ("Compl.") at ¶ 35-40; Clergeau Tr. 37:3-13].  Clergeau asserts that there are systemic deficiencies in the prison's provision of mental health care through a smattering of allegations.  [Dkt. 87 at ¶ 59].  He did not submit any requests for a reasonable accommodation under the Americans with Disabilities Act ("ADA") for his mental health disabilities.  [Clergeau Tr. at 44:12-18].  Clergeau responds he is not an expert on his conditions and is unaware as to what accommodations could be requested.  [Id. at 44:23-45:5].  He did file a written grievance with Superintendent Silva.  [Id. at 44:5-11].

### C.  Use of Force Training

Clergeau challenges the use of force training provided for DOC correctional officers as being insufficient to prevent the excessive use of force used upon him.  The Officer Defendants underwent initial training, including the DOC's standard operating procedures regarding the use of force a decade or more ago.  [Dkt. 87 at ¶ 63].  Their more recent training would have included the annual in-service training on inmate procedures, an annual use of force on inmates and proper use of restraints training, and a de-escalation refresher.  [Id. at ¶ 64; Dkt. 76-6 at 40, 50, 66].  Among the policies the COs would have been trained on would have included 103 CMR 505, which requires staff members to intervene when they observe other staff members using excessive force.  [Dkt. 87-7 at 6].  Another provision of the CMR requires staff to attempt to use de-escalation tactics before the use of any force.  [Id.].

### D.  Retaliation Against Clergeau

Clergeau also asserts that since the altercation, the Officer Defendants and other COs have continued to retaliate against him in a variety of ways.  These include Officer Shaw laughing and joking about the incident in front of Clergeau; Officer Lussier telling him he would "mess him up" if they ever fought again; being refused lunch in the prison; being placed in watch cells; and an incident where an unnamed officer touched him inappropriately.  [Clergeau Tr. 29:13-30:20; 32:2-10; 35:7-13; 41:22-43:7; 52:13-20].  Clergeau also alleges that Officer Titus[6] went around his cell, threw his things around, and told Clergeau that he did so for getting Officer Sampson fired.  [Id. at 34:6-20].

## II.    LEGAL STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (citing Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990)). Summary judgment may be granted when the record, viewed in the light most favorable to the non-moving party, presents "no genuine issue of material fact," and the moving party is entitled to judgment as a matter of law.  Paul v. Murphy, 948 F.3d 42, 49 (1st Cir. 2020) (citation omitted).  The Court must consider (1) whether a factual dispute exists; (2) whether the factual dispute is "genuine," such that a "reasonable fact-finder could return a verdict for the nonmoving party on the basis of the evidence;" and (3) whether a fact genuinely in dispute is material, such that it "might affect the outcome of the suit under the applicable substantive law."  Scott v. Sulzer Carbomedics, Inc., 141 F. Supp. 2d 154, 170 (D. Mass. 2001); see also Napier v. F/V DEESIE, Inc., 454 F.3d 61, 66 (1st Cir. 2006).  Courts must evaluate "the record and [draw] all

---

[6] Officer Titus is not one of the named defendants.

reasonable inferences therefrom in the light most favorable to the non-moving parties." Est. of Hevia v. Portrio Corp., 602 F.3d 34, 40 (1st Cir. 2010) (citing Houlton Citizens' Coal. v. Town of Houlton, 175 F.3d 178, 183–84 (1st Cir. 1999)).  A non-moving party may "defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trial worthy issue persists."  Paul, 948 F.3d at 49 (citation omitted).

## III.    DISCUSSION

Clergeau brings claims for violation of the ADA (Count II)[7], violation of the Eighth Amendment (Count III), physical injury from the use of excessive force (Count IV), and retaliation (Count III).[8]  [Compl. at ¶¶ 44-62].

### A.  Eighth Amendment and Excessive Force, Assault, and Battery (Counts III and IV)

Clergeau's Eighth Amendment claims are brought pursuant to 42 U.S.C. § 1983, which provides a cause of action for the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by any person acting "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory."  [Compl. at 4].  An Eighth Amendment violation has two components: "one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect."  Staples v. Gerry, 923 F.3d 7, 13 (1st Cir. 2019).  As far as the subjective prong, in the prison context "only the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the

---

[7] Clergeau's pro se complaint does not include a Count I.  [Dkt. 1-1].  The Court notes that Clergeau filed the complaint as a pro se plaintiff and later acquired counsel. In parts of his complaint, Clergeau makes reference to violations of state regulations and policies.  [Id. at 14-15].  However, "a private cause of action cannot be inferred solely from an agency regulation." Frawley v. Police Com'r of Cambridge, 473 Mass. 716, 46 N.E.3d 504, 511 (Mass. 2016) (quoting Loffredo v. Center for Addictive Behaviors, 689 N.E.2d 799, 803 (Mass. 1998).  Therefore, any claim for damages that Clergeau seeks that is based solely on the failure to enforce state regulations is not viable.

[8] Clergeau's complaint describes Count V as being emotional distress. [Compl. at ¶¶ 61-62].  This does not appear to be a separate claim for emotional distress, but rather a description of the injuries Clergeau suffers from that Defendants inflicted.

9

Eighth Amendment." Whitley v. Albers, 475 U.S. 312, 319 (1986). The "critical question" becomes "whether the force was applied 'maliciously and sadistically for the very purpose of causing harm . . . rather than 'in a good-faith effort to maintain or restore discipline.'" Skinner v. Cunningham, 430 F.3d 483, 488 (1st Cir. 2005) (quoting Hudson v. McMillian, 503 U.S. 1, 7 (1992) and Whitley, 475 U.S. at 320–21).[9] "Unless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain under the standard we have described, the case should not go to the jury." Whitley, 475 U.S. at 322. The objective harm requires that the injury alleged against the incarcerated individual be more than de minimis. Mullen v. Dep't of Corr. of Mass., 643 F. Supp. 3d 238, 247 (D. Mass. 2022).

Clergeau's case largely turns on who should be believed about what occurred in the five minutes while he was in the backroom, as well as while he was in the HSU when the parties were out of sight from any cameras. There are several factual disputes about what occurred, many of which could alter the outcome of the case. While Clergeau and Shaw may have verbally clashed earlier in the day, it is not in dispute that Clergeau was the one who initiated the physical altercation between the two. Clergeau does not recall what happened, while Shaw and Lussier attest that they saw Clergeau move towards Shaw and strike him multiple times. [Clergeau Tr. at 15:2-16:19; Dkt. 87 at ¶ 17; Dkt. 87-4 at 6-7]. Shaw attests that Clergeau struck him in the head with multiple punches. [Shaw Tr. at 32:9-11]. Lussier also attests that he was struck by Clergeau multiple times and sustained injuries. [Lussier Tr. at 19:2-21; Polak Tr. 22:7-10]. Even if Shaw's injuries were the result of his head hitting the ground, the confrontation with Clergeau was clearly violent enough that it led to the incapacitation of Officer Shaw immediately

---

[9] Defendants do not dispute the fact that they were acting under color of state law or that one or more of them used force. [Dkt. 76 at 14].

after he leaves the backroom.  [Backroom video 7:38-39; Shaw Tr. 31:3-4, 33:22-34:4, Dkt. 87-3 at. 39:7-9].

At the same time, when viewing the facts in the light most favorable to Clergeau, a reasonable factfinder could find that Clergeau was subjected to a level of force beyond that which was necessary, especially in the time period after he was no longer a threat to the officers around him.  Clergeau and Officer Polak attest that he was handcuffed almost immediately upon being dragged into the backroom, yet Clergeau remained on his stomach the entire time he was in that room, which was in excess of five minutes.  [Dkt. 87 at ¶ 29; Clergeau Tr. 17:1; 21:1-12; Polak Tr. 17:9-10; 22:11-22].  He was also swiftly shackled and placed in leg restraints, which Clergeau believes happened within seconds.  [Lussier Tr at 24:19-24; Clergeau Tr. 19:20-21].

At some point after the restraints were placed on his legs and he was fully shackled, the officers felt the situation was under control.  [Keeler Tr. 18:17-23].  At this juncture, the factual dispute between the parties is at its apex.  Clergeau recalls being kicked in the face multiple times, although he only named Officer Sampson in his deposition.  [Clergeau Tr. 17:1-10, 22:21-23:2].  This does not mean, however, that Officer Sampson is the only Officer who may have kicked him in his face.  Clergeau names Officer Lussier as the individual responsible for his dislocating his fingers.  [Clergeau Tr. 17:23-24].  Clergeau emerges from the room with his face bloodied and with multiple injuries including dislocated fingers, a fractured jaw, and significant damage to his eye, which together indicate that a serious amount of force was applied.[10]  [Id. at 47:1-11; Dkt. 87-13 at 1, 6; Dkt. 87-5 SUOF North 1 to Elevator].  The timeline here is unclear but given the number of officers who subdued Clergeau, the length of time he remained on his

---

[10] While it is unclear when these injuries were sustained, given Clergeau's allegation that he was also physically abused in the HSU room, the video shows that at least some of the injuries were sustained before he arrived in the HSU. [Dkt. 87-5 SUOF North 1 to Elevator].

stomach in the room, and the speed at which he may have been put in restraints, there is a dispute

of fact as to whether Clergeau was beaten severely and disproportionately after he was no longer

a threat.  A jury could find that the Officer Defendants used force "maliciously and sadistically

for the very purpose of causing harm . . .  rather than in a good-faith effort to maintain or restore

discipline."  Skinner, 430 F.3d at 488.  The question of what force was applied after the threat

Clergeau posed subsided presents a trial-worthy issue.  The same is true of any force that may

have been used to subdue Clergeau when he was in the HSU, where Clergeau alleges he was

"tortured" and which the other witnesses do not address.  [Clergeau Tr. 24:15-24; 27:4-18].

A challenge for Clergeau is that the officers' memories are much clearer than his own.

Clergeau states that he cannot fully remember what happened after he confronted Shaw.

[Clergeau Tr. at 16:10-16:19].  However, it is not the case that he claims to remember nothing at

all.  Clergeau testified that he was going in and out of consciousness from being struck in the

head and that he remembers enough to recall how and where he was receiving those blows.

[Clergeau Tr. 16:13-14; 20:1-22; 22:23-23:2].  Clergeau also attested that his vision was

obscured from his eyes being shut from the damage, and this is partially corroborated by the

medical evidence.  [Id. at 22:17-20; 87-13 at 1, 6].

It is true that the Officer Defendants who were subduing Clergeau faced a unique set of

circumstances involving a prisoner's assault on an officer, and the Court must give some leeway

to their instant decisions made in such a dangerous situation.  See Saucier v. Katz, 533 U.S. 194,

205 (2001) ("the reasonableness of the officer's belief as to the appropriate level of force should

be judged from that on-scene perspective" and the court should give some "deference to the

judgment of reasonable officers on the scene").  At the same time however, the concern

underlying the Court's decision here is not based on the split-second use of force by the officers

against Clergeau, but by their alleged continued use of force after the danger subsided.
Consequently, less deference is owed to an officer's conduct when he continues to employ the
use of force after it no longer serves any legitimate purpose.  Plaintiff also raises the question of
whether there was a realistic window during which de-escalation techniques could have been
used, as none of the officers reported employing any such techniques during and in the lead-up to
the altercation.  [See Dkt. 87 at ¶ 17, 21; Shaw Tr. 35:20-24; 38:7-10].  His assertion may not be
particularly strong, yet Plaintiff has defended his claim sufficiently for his excessive use of force
claim to survive.

## Qualified Immunity

Because of the factual disputes that remain unanswered here, the Court is unable to
ascertain whether the Officer Defendants are entitled to qualified immunity.  Qualified immunity
shields government officials "from liability for civil damages" when "their conduct does not
violate clearly established statutory or constitutional rights of which a reasonable person would
have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  It "does not 'shield public
officials who, from an objective standpoint, should have known that their conduct was
unlawful.'"  Haley v. City of Boston, 657 F.3d 39, 47 (1st Cir. 2011) (quoting Pagán v.
Calderón, 448 F.3d 16, 31 (1st Cir. 2006)).  The Court must determine whether the officers
reasonably believed their actions were lawful in light of clearly established law and the
information they possessed at the time of their allegedly unlawful conduct.  Lowinger v.
Broderick, 50 F.3d 61, 65 (1st Cir. 1995).  An officer can avoid liability so long as their belief in
the lawfulness of their conduct was reasonable, even if that belief was later found to be mistaken.
Id.  While qualified immunity is a question of law for the judge, and ideally should be resolved
in advance of trial, sometimes disputes as to material facts will preclude summary judgment

from being granted.  Kelley v. LaForce, 288 F.3d 1, 7 (1st Cir. 2002) (internal quotations omitted).  In such instances, the Court can wait until after the facts have been settled to determine whether the officer's conduct was objectively reasonable and falls under the qualified immunity umbrella.  Id.

The Officer Defendants may be entitled to qualified immunity if it bears out that they honestly and reasonably thought the level of force they used was necessary, even if the facts established later that the level of force used was more than what was needed.  See Lowinger, 50 F.3d at 65.  However, Defendants would not be entitled to qualified immunity if the facts establish that Clergeau continued to be beaten well after the officers knew the use of force was no longer necessary. Hope v. Pelzer, 536 U.S. 730, 738, 741 (2002) (finding the use of a hitching post was violation of the Eighth Amendment and not protected by qualified immunity because it caused a "substantial risk of physical harm" and "unnecessary pain" long after "any safety concern had long since abated").  It is beyond dispute that the use of force for the sake of inflicting harm, such as for retribution for his assault on officers, is unlawful.  See Whitley, 475 U.S. at 319; Skinner, 430 F.3d at 488.

Accordingly, Defendants' Motion for Summary Judgment on Clergeau's claims related to the use of force is denied as to Officers Polak, Evans, Lussier, and Shaw.[11]  However, given that there are no factual allegations that Officer Keeler spent any time in the backroom, took any part in subduing Clergeau, or participated in any additional violence in the HSU [see Dkt. 87], the claims against Officer Keeler are dismissed.

---

[11] While Shaw was not in the room for the duration of the altercation, given that he left after suffering a significant injury, he appears to have been in the room for some period of time after Clergeau was restrained. Therefore, there is a factual dispute as to his participation in any excessive force that allegedly occurred in the backroom. [See Lussier Tr at 24:19-24; Clergeau Tr. 19:20-21; backroom video 7:35-39].

**B.  Indifference to Clergeau's medical needs in violation of ADA and Eighth Amendment (Counts II, III, and V)**

Clergeau also asserts claims of inadequacy of his health treatment, including the Defendants' indifference to the injuries he sustained after the altercation and for the Defendants' deliberate indifference to his need for mental health treatment in violation of the ADA.  [Compl. at ¶¶ 47-51, 54, 57-58].  Under the Eighth Amendment's prohibition on cruel and unusual punishment, when individuals are incarcerated and the state has deprived them of their ability to provide for themselves, the failure to provide adequate care "may actually produce physical 'torture or a lingering death.'"  Brown v. Plata, 563 U.S. 493, 510 (2011) (quoting Estelle v. Gamble, 429 U.S. 97, 103 (1976)).  To demonstrate an Eighth Amendment violation for inadequate care, a prisoner must show: (1) "an objective prong that requires proof of a serious medical need[;]" and (2) "a subjective prong that mandates a showing of prison administrators' deliberate indifference to that need."  Kosilek v. Spencer, 774 F.3d 63, 82 (1st Cir. 2014).  The first prong does not impose "a duty to provide care that is ideal, or of the prisoner's choosing." Id.  The second refers to "a narrow band of conduct" Feeney v. Corr. Med. Servs. Inc., 464 F.3d 158, 162 (1st Cir. 2006) and "requires evidence that the failure in treatment was purposeful." Kosilek, 774 F.3d at 83.  The Court must also consider security considerations that go into maintaining the functioning of the prison.  Id.

As far as the deficiencies in the medical care that Clergeau received after the incident, the facts fail to support an Eighth Amendment claim.  While there may have been a delay in his treatment as a result of conversations between the medical staff and the COs, Clergeau was taken to a hospital where he received treatment shortly after.  [Clergeau Tr. 26:2-21].  The medical records confirm Clergeau was admitted and treated at Umass Memorial Health Care by 9:17 AM and was discharged before 1:00 PM.  [Dkt. 87-13 at 2].  Clergeau does not allege that he suffered

consequences from his delay in treatment.  Even if Clergeau had established that he had a serious medical need, the facts are not sufficient to support an inference of deliberate indifference. Despite his dissatisfaction, the Defendants did not have "a duty to provide care that is ideal, or of the prisoner's choosing."  See Kosilek, 774 F.3d at 83.  To sustain a deliberate indifference claim, the plaintiff must also have "evidence that the failure in treatment was purposeful."  Id. The care that Clergeau did receive after the incident does not indicate that the Defendants had the requisite intent to deprive him of medical treatment.

As part of his Eighth Amendment claim, Clergeau highlights not just the care he received in the aftermath of the incident, but also the care he has received since, particularly when it comes to his mental health.  Clergeau points to his mental health ailments, which were apparent to Defendants before the incident, and the deterioration of his mental health thereafter as evidence of deliberate indifference to his need for treatment.  [Dkt. 80 at 9].  He also argues that his "Medic-5" requests, wherein he asks to speak with a mental health clinician, is an insufficient response to his mental health needs.  [Id.].  He points to his impeded efforts to obtain mental health services in the weeks that followed the incident as further evidence.  [Id. at 12].

The medical/mental health care provided for state inmates is provided by licensed medical professionals employed by an independent contractor, in this case the Massachusetts Partners for Correctional Health.  [Dkt. 87 at ¶¶ 65-66].  However, the DOC's leadership and health officials are still responsible for the implementation and monitoring of its medical services policies and the level of medical care provided to inmates.  [Dkt. 87-8 at 1].

Clergeau's perception is that when he called Medic-5, the responding clinician interrogated him and told him it was his issue to resolve.  [Clergeau Tr. 37:22-39:2].  To call Medic-5, Clergeau had to first ask the Sergeant, which he asserts led to the denial or lack of

access to mental health treatment.  [Id. at 43:8-24].  Clergeau also points to his experiences in a watch cell, also known as a crisis cell, which limits his ability to turn off lights that officers can keep on at will, and his access to soap and other hygiene products.  [Id. at 41:22-42:24].  Clergeau claims to have been in those crisis cells on many occasions.  [Id. at 42:19-22].

Clergeau's complaints about the deficiencies in his mental health treatment fail to establish a viable Eighth Amendment claim, as the issues Clergeau raises cannot fairly be said to be equivalent to the denial of treatment—purposeful or otherwise.  Random and conclusory statements about the failure to provide mental health care are insufficient, and so are the examples Clergeau highlights to support his claim.  Clergeau first points to the Medic-5 process where nurses speak to him in a hostile manner, more akin to an officer.  [Clergeau Tr. 37:22-39:22; 40:15-24].  He also points to delays that occur where he requests that officers allow him to speak with a mental health worker before he is taken to a room to speak with one himself.  [Id. at 40:3-8].  Again, such care may not be ideal, but perfection is not required.  See Kosilek, 774 F.3d at 83.  To survive at this stage requires some factual underpinning, and Clergeau's claim fails here because it does not connect the particular flaws in his treatment to his need for additional care.  See id. at 82.  Nor does it imply that the Defendants have the requisite intent of deliberate indifference towards Clergeau's needs.  See id.  Clergeau does state that he has been denied access to support from mental health staff, even when he is in a crisis, despite raising the issue with the supervisors of the unit he was in.  [Clergeau Tr. 43:8-44:3].  Clergeau does not tie this denial to any of the named defendants.  The only exception is the Defendants who are the prison's administrators and are responsible for overseeing the work of third-party health vendors.  The facts here, however, are too bare bones to connect that oversight, or lack thereof, to the particular deficiencies Clergeau highlights.

17

The same fate befalls Clergeau's ADA claim.  Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  This discrimination can include scenarios wherein "deliberately requiring a plaintiff to endure unnecessary hardship in order to access a program or service, when that hardship could easily be eliminated by a reasonable accommodation." Shedlock v. Dep't of Corr., 442 Mass. 844, 855 (2004).  The court must take into account the "reasonable requirements of effective prison administration" and the broader prison environment into its assessment of the request for accommodation.  Id.

As in his deliberate indifference claim, Clergeau's criticism of the treatment he receives fails to explain how the facts substantiate his ADA claim.  Clergeau has a serious mental illness that requires treatment, but his disappointment in the Medic-5 process does not amount to a denial of that treatment.  Clergeau mentions the hostile manner with which healthcare workers sometimes treat him.  [Clergeau Tr. 37:22-39:22; 40:15-24].  He does not describe how that conduct resulted in his being "excluded from participation in or be[ing] denied the benefits" available to others at SBCC.  See 42 U.S.C. § 12132.  Clergeau also raises grievances about his time in a segregated unit and about his denial of access to care.  [Clergeau Tr. 43:8-24; 44:23-45:12].  These claims are devoid of sufficient factual allegations, especially regarding the treatment Clergeau expected to receive and where the care Clergeau did receive fell short.  [Id. at 44:23-45:4].  Clergeau also makes no suggestion as to whether a reasonable accommodation would alleviate the hardship—as would usually be required for him to sustain such a claim.  See Kiman v. New Hampshire Dep't of Corr., 451 F.3d 274, 283 (1st Cir. 2006) ("In cases where the alleged violation involves the denial of a reasonable modification/accommodation, the ADA's

18

reasonable accommodation requirement usually does not apply unless 'triggered by a request'"

unless the need for that accommodation is obvious) [id. at 44:23-45:4].

C. **Inadequate Training and Supervision on the Part of DOC, Commissioner Mici, Superintendents Silva, Kenneway, and Gray (Counts II, III, and IV)**

Plaintiff claims that the leadership of DOC and SBCC, failed to adequately supervise and

train their officers.  [Compl. at ¶¶ 53-58].  Under Section 1983, there is no liability for

supervisors under a respondeat superior basis and any liability that does attach to supervisors

must be based on their own acts or omissions.[12]  Justiniano v. Walker, 986 F.3d 11, 20 (1st Cir.

2021).  In the context of a failure to train or supervise claim, where a subordinate violates the

constitutional rights of the plaintiff, the supervisor defendant's actions must amount to deliberate

indifference to those violations.  Id.  Causation is an essential element in such a claim, which is

demonstrated by showing that the "lack of training caused [the officer] to take actions that were

objectively unreasonable and constituted excessive force."  Id. (quoting Young v. City of

Providence ex rel. Napolitano, 404 F.3d 4, 27 (1st Cir. 2005)).

Causation can be demonstrated by "showing inaction in the face of a 'known history of

widespread abuse sufficient to alert a supervisor to ongoing violations.'"  Id. at 21 (quoting

Maldonado–Denis v. Castillo–Rodríguez, 23 F.3d 576, 582 (1st Cir. 1994)).  At the same time, a

plaintiff is still obligated to demonstrate how the identified deficiencies would have been

remedied by that training.  Baptiste v. Sheriff of Bristol Cnty., 617 N.E.2d 641, 644 (Mass. App.

1993) (explaining that under Section 1983, the sheriff overseeing the jail was not liable for a

stabbing that used scissors from the jail's barbershop because plaintiff failed to demonstrate how

---

[12] For this same reason, Clergeau's Eighth Amendment claims brought against Mici, Silva, Kenneway, and Gray for the actions of the officers during the altercation are not viable. The available facts, and allegations in the Complaint, do not indicate that they participated in, ordered, or were otherwise aware of or indifferent to the alleged use of excessive force against Clergeau.

the additional training would have prevented the incident); McLeod-Lopez v. Algarin, 603 F. Supp. 2d 330, 337 n.2 (D.P.R. 2009) ("an assertion that a supervisor 'failed to train' his subordinates and that he should be held liable for such failure, without identifying the factual underpinnings of such failure, nor identifying the causal nexus between the failed training and the . . . misconduct, is not enough").

Clergeau's claim of inadequate training and supervision fails to establish the connection between the use of excessive force and any training that would have prevented it. See id. There are examples of poor behavior and misconduct that Clergeau highlights, including Officer Shaw threatening Clergeau despite knowing that he had significant mental health challenges. [Dkt. 80 at 13]. All the examples provided though stem from the individual altercation, which does not establish causation by itself. [Id.]. That single incident is not equivalent to "a history of widespread abuse" or the narrow circumstance "where a violation 'is a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations.'" Echavarria v. Roach, 565 F. Supp. 3d 51, 89 (D. Mass. 2021) (quoting Justiniano, 986 F.3d at 20-21). Clergeau points to the failure of any officers to use de-escalation techniques or to adequately deal with the mental health conditions they knew he had. [Dkt. 80 at 14-15]. Again, however, without any facts indicating how additional or altered training would have avoided the same outcome, Clergeau does not have enough for his inadequate training claim to survive. See Baptiste, 617 N.E.2d at 644.

### D. Retaliation (Count III)

"Government actors offend the First Amendment when they retaliate against an individual for constitutionally protected speech." González–Droz v. González–Colón, 660 F.3d 1, 16 (1st Cir. 2011). To articulate a First Amendment retaliation claim, the plaintiff must: (1)

show that his conduct was constitutionally protected; and (2) show a causal connection between his protected speech and the retaliatory response. Goldstein v. Galvin, 719 F.3d 16, 30 (1st Cir. 2013). The latter is established by showing that "the plaintiff's conduct was a 'substantial' or 'motivating' factor in bringing about the allegedly retaliatory action." Id. (quoting Mt. Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274 (1977).

Clergeau highlights a number of instances in which he was treated poorly by COs following the incident, but his retaliation claim fails because he does not show the connection between that treatment and any of his own First Amendment protected activities. [Dkt. 80 at 15-16]. The Officer Defendants' alleged behavior is troubling, including their laughing at Clergeau's injuries, threatening him further, and any changes they may have made to the conditions of his confinement. [Id.]. However, Clergeau does not connect any of these issues to any conduct of his that was protected by the First Amendment. He does raise an instance where his cell was ransacked and some of his grievance papers were destroyed in retaliation for his assistance in getting an officer fired. [Id.]. However, the officer he names as responsible for this, Officer Titus, is not one of the named defendants. [Id.]. Clergeau thus has not shown that his constitutionally protected conduct produced a retaliatory response from the Defendants. See Goldstein, 719 F.3d at 30. Therefore, his retaliation claim is not viable and is thus dismissed.

## IV.   CONCLUSION

For the foregoing reasons, the Defendants' Motion for Summary Judgment [Dkt. 75] is **GRANTED IN PART** and **DENIED IN PART**. The Motion is **DENIED** as to the Eighth Amendment claims for excessive use of force and assault and battery that is brought against the Officer Defendants in their personal capacity, with the exception of Officer Keeler (Count III). The Motion is **GRANTED** as to the claims against Officer Keeler. The Motion is **GRANTED**

as to Plaintiff's claims that Defendants violated the ADA (Count II), failed to provide necessary medical care or tend to his mental health needs (Count II and III), failed to offer or undergo proper training regarding the use of excessive force (Counts II, III, and IV), and as to the claim that Defendants improperly retaliated against him (Count III**)**. The Motion is **GRANTED** as to any claims brought against the DOC, Steven Silva, Stephen Kenneway, Dean Gray, and Carol Mici (Counts II, III, IV, V).

**SO ORDERED.**

Dated: January 27, 2024                                    /s/ Angel Kelley
                                                           Hon. Angel Kelley
                                                           United States District Judge